UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 24-cr-194 (ADM/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **MR. HARRELL'S SENTENCING** |
| v. | ) | **POSITION PAPER** |
| | ) | |
| DONATUS RAY HARRELL, | ) | |
| | ) | |
| Defendant. | ) | |

  Donatus Harrell is before the Court to be sentenced for possession with intent to distribute cocaine. Prior to committing this offense, Mr. Harrell had been doing remarkably well in the community. He had a good-paying job at Ardent Mills. He consistently worked overtime to earn enough to support himself and his children. And, though he has significant criminal history, he went more than a decade without picking up any new charges. However, when personal and legal difficulties reemerged, Mr. Harrell lost his good job and fell back on old, negative coping habits: alcohol and drugs. This, in turn, reignited his substance use disorder, which clouded his judgement and led to this offense.

  To his credit, Mr. Harrell swiftly accepted responsibility for his crime, with no pretrial litigation. He is truly remorseful and has worked hard over the last 11 months to engage in as much mental health programming as possible so he can come out of this experience with better insight and healthier coping skills to avoid the negativity of his past. His overriding concern is getting himself into a position where he can once again support his children and help ensure they lead positive lives. Mr. Harrell asks the Court to apply

the requite sentencing factors and impose a sentence of 92 months in federal prison followed by supervised release. This is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).

**I.   THE 3553(a) FACTORS SUPPORT A SENTENCE OF 92 MONTHS IN CUSTODY FOLLOWED BY SUPERVISED RELEASE.**

Mr. Harrell pleaded guilty to a non-violent drug offense that carries a 5-year mandatory minimum sentence. PSR ¶ 94, ECF No. 40. The final presentence report (PSR) determines Mr. Harrell's advisory Guidelines range is 188 to 235 months, based on total offense level 31 and criminal history category VI. PSR ¶ 95. This is due entirely to application of the career-offender Guidelines, given two of Mr. Harrell's dated priors from 2011, committed nearly 13 years before the instant offense. *Id.* ¶¶ 39, 41.

Without career offender, Mr. Harrell's Guidelines range would be 92 to 115 months, based on total offense level 21 and criminal history category VI. PSR ¶ 3, *see also id.* at A.1. This range is well above the 60-month mandatory minimum. For the reasons below, Mr. Harrell respectfully requests that the Court vary downward from the career-offender Guidelines and impose a sentence within the range of 92 to 115 months.

**A. Federal courts across the country have rejected the flawed career-offender Guidelines for advising sentencing ranges that are greater than necessary to comply with § 3553(a).**

It is no secret that the career-offender Guidelines are deeply flawed. Federal courts across the country recognize that career offender generates sentencing ranges far harsher than necessary to achieve the statutory goals of sentencing. In 2016, after years of research and study, the U.S. Sentencing Commission released a Report to the Congress: *Career*

*Offender Sentencing Enhancements* ("2016 Career Offender Report").[1]  Pertinent here, the Commission found that while the percentage of defendants sentenced under career offender remained steady during the 10-year study, *see id.* at 18, fig. 1, the percentage of "within Guidelines" career-offender sentences dropped precipitously during that same period: from 43.3% to only 27.5% of defendants sentenced within their career-offender Guidelines range, *id.* at 2.

This consistent pattern of sentencing courts rejecting the career-offender Guidelines continues through present day.  Most recent Sentencing Commission data show that, between 2019 and 2023, 56.6% of all career-offender defendants received a downward variance from the Guidelines range, with an average reduction of nearly 40%.[2]  Another 10.6% of career-offender defendants received a downward departure for reasons beyond substantial assistance.[3]  At bottom, **just 20.2%** of career-offender defendants received a sentence within their career-offender Guidelines range.[4]  This amounts to widespread rejection of the career-offender Guidelines.

---

[1] *Available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf

[2] U.S. Sentencing Commission, *Quick Facts: Career Offenders FY23*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Career_Offenders_FY23.pdf

[3] *Id.*

[4] *Id.*



U.S. Sentencing Commission, *Quick Facts: Career Offenders FY23*.[5]

Troublingly, too, Sentencing Commission data show the career-offender Guidelines apply disproportionately to Black defendants:[6]

---

[5] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Career_Offenders_FY23.pdf

[6] 2016 Career Offender Report at 19, *available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf



This is a serious problem that goes beyond merely overstating what is a reasonable sentence. It goes directly to our legal system's fundamental notions of fair play and equal justice. This Court has wide discretion to reject a sentencing Guideline for having a negative and disparate impact on one racial group. *See Kimbrough v. United States*, 552 U.S. 85, 110 (2007); *see also Village of Arlington Heights v. MHDC*, 429 U.S. 252, 265 (1977) (disparate impact is relevant to determine whether a law amounts to "invidious racial discrimination"); *United States v. Williams*, 788 F. Supp. 2d 847, 888 (N.D. Iowa 2011) ("Variances from the Guidelines **are frequent** in this group precisely because the career offender and crack cocaine guidelines are far too severe, clearly overbroad, and, in the case of the crack guideline, have a profoundly disparate impact on African American offenders." (emphasis added)).

Just as the vast majority of federal sentencing courts have done, this Court should also reject the career-offender Guidelines as unreasonably harsh and racially disproportionate.

5

Without the deeply flawed and oft-rejected career-offender Guidelines, Mr. Harrell's sentencing range would be 92 to 115 months. PSR ¶ 3, *see also id.* at A.1. The Court should impose a sentence within this range. Doing so would not minimize Mr. Harrell's criminal history, as he would remain in criminal history category VI even without career offender.[7] Indeed, the Sentencing Commission's *2016 Career Offender Report* recognized the "continued reliability of the guideline's criminal history score in predicting recidivism, and the impact an offender's criminal history score has on increasing the offender's range of punishment."[8] In other words, without even getting to career offender, the Guidelines' criminal history score *already* accurately predicts recidivism and increases punishment accordingly. As a result, imposing a sentence within the range of 92 to 115 months fully and accurately accounts for Mr. Harrell's criminal history and appropriately increases his punishment as a result.

Imposing a sentence within in the range of 92 to 115 months also reflects the circumstances of this non-violent drug offense, where Mr. Harrell did not use or threaten any firearm, weapon, or violence against any person, discussed below.

---

[7] Notably, Mr. Harrell receives 3 criminal history points for an offense he committed in 2003 at the age of 22. PSR ¶ 34. He is now 43. The Sentencing Guidelines recognize that Mr. Harrell's "youthfulness at the time of [a] prior offense" may be reason for a downward departure to a lower criminal history category. *See* U.S.S.G. § 5H1.1. Without this dated prior (and without career offender), Mr. Harrell would have 12 criminal history points, which corresponds to criminal history category V.

[8] 2016 Career Offender Report at 43.

### B. Nature and circumstances of the offense

Ninety-two months in federal prison reflects the nature of Mr. Harrell's offense. He fully accepted responsibility, without any pretrial litigation, for possessing with intent to distribute 547 grams of cocaine. As he writes the Court in his acceptance statement, "I regret not using my cognitive skills and not being more responsible and for letting down my family and community." PSR ¶ 13. He knows he hurt his family and others through his offense. At the same time, Mr. Harrell's offense was entirely nonviolent: he did not use or threaten violence against any person. On balance, 92 months in federal prison, a sentence within Mr. Harrell's Guidelines range absent career offender, fully reflects the seriousness of this non-violent drug offense and Mr. Harrell's unqualified acceptance of responsibility.

### C. Personal history and characteristics

Mr. Harrell is 43 years old. When he finally completes his 92-month federal prison sentence, he will be 50. Knowing that he will miss out on these next years with his family has been particularly difficult. He is the father to ten children. As his numerous support letters attest, Mr. Harrell is a loving and committed son, brother, father, cousin, and friend.

Our attachment to primary caregivers creates a blueprint for how we perceive love, connection, and safety in adulthood. With an ACEs score of 9, Mr. Harrell has experienced profound trauma; he learned early on that his world was inherently unsafe. His father put a gun in his hand—with direction to shoot if a drug deal went sideways—when he was just 6 years young. He witnessed his first homicide at 7, and he suffered chronic domestic violence and sexual abuse throughout his childhood. Young Donatus' example of

"normalcy" in a romantic relationship included violence and abuse. His example of "normalcy" in obtaining financial security involved drug sales and self-policing instead of a reliance on State protection. Mr. Harrell is tasked with changing his life script, as the maladaptive coping mechanisms he once used to protect himself and survive in the face of extreme adversity can no longer serve him.

Through the recent therapeutic services offered in jail, Mr. Harrell became aware of the generational cycle of violence, and he is now committed to breaking this cycle for himself and for his children. While he continues to work on healing his childhood wounds and learning from his mistakes, the area where Mr. Harrell takes most pride, as a positive influence, is as a father. His purpose in life is his children. He acknowledges that he failed his children by making the choices that led to this case. He intends to do everything he can to provide them with more opportunities and a better life once he is released.

When Mr. Harrell was living in the community, he was able to provide consistency for his children—he kept a clean house, ensured his kids were engage in school, made sure his children were around safe adults, and administered medication to his son as they were prescribed. While incarcerated, Mr. Harrell has been listening to podcasts and watching videos that would be of interest to his kids; this helps him feel connected to them. For example, one of his sons loves dinosaurs, and so, Mr. Harrell has turned that into his special interest, too.

Notably, Mr. Harrell's five-year-old son has stage-three kidney failure. He is eligible for a kidney transplant and Mr. Harrell would like to donate his own kidney if he is a match. Without a transplant, his son likely has just five years to live. Learning about

8

his son's prognosis was devasting to Mr. Harrell and he will do whatever he can to help his son survive. This has been strong motivation for Mr. Harrell to work hard toward self-improvement so he can finally reunite with and be the father his children need and deserve.

Mr. Harrell has focused his time in custody on positive programming geared toward healing his mental health. He completed an astonishing **342 courses** on the tablets at the Sherburne County Jail, the 10-week Lone Wolf program to treat his substance abuse disorder,[9] and dozens of additional course hours, including on anger management, religious studies, job training, and parenting, while at the Dakota County Jail.

Mr. Harrell can now articulate how his automatic thought patterns and insecurities play out in his intimate partner relationships. A combination of anger, low self-esteem, and lack of control led him to escalate conflict. As he reflects, "I always needed to have the last word…and this is rooted in how I grew up." One of the skills he learned in a Dialectical Behavioral Therapy (DBT) group—radical acceptance—has helped him to release the negative hold his father has on his life. Instead of grasping for praise and acceptance from a man who will never love Mr. Harrell the way he needed to be loved, Mr. Harrell has accepted who his father is and let go.

"Trust issues" have made Mr. Harrell avoidant and noncommittal in relationships. He realizes that he needs to focus on healing himself before entering a new relationship. In his community, he was raised to believe that he needed to be with a woman to be a

---

[9] In fact, Mr. Harrell found the Lone Wolf program so helpful in reshaping his thinking for the better, that he continues to regularly attend the program long after his first ten weeks were up.

9

respectable man. Now, he is motivated to focus on his own personal growth and care for his children. Mr. Harrell noticed that he is less impulsive and reactive than he used to be. Now, he "doesn't have to express all his thoughts," and he has coping skills like breathing and thought stopping to help him to remain calm and rational when things get out of control.

Mr. Harrell is motivated to continue processing through his trauma and addressing mental health challenges through therapy. He is also motivated to participate in chemical dependency treatment. He knows that "to be successful [he] needs to change." He is focused on the future and is taking advantage of all opportunities to improve his resume, learn new skills, and grow as a person. Mr. Harrel said, "If I was released tomorrow, I would send my resume out to 10 places, look into treatment facilities, and hug my kids." When envisioning his future in the community, he says, "getting a job will not be the hard part. I know I can get a job. I can apply myself." He's not worried about falling back into the street economy if he stays sober. He says, "I sold drugs to survive." Now, he realizes, he can survive better through professional help and treatment.

One of Mr. Harrell's greatest fears is his kids turning to the streets. Unlike his own father, Mr. Harrell never intentionally exposed his children to "the street life." He did the best he could to shield them from it. He says, "the only reason I would return to my previous community, is if I talked to the youth to deter them from the street life." Mr. Harrell is passionate about supporting youth, specifically Black boys, and using his experience to deter the next generation from making the same mistakes he did. Mr. Harrell has hope for his future and it is obvious, in his expression of insight and motivations to

change, that he is resilient and steadfast in his commitment to influence his family and community for the better. This shows that a sentence of 92 months in prison is sufficient, but not greater than necessary.

### D. Societal and institutional needs

To determine what is a reasonable sentence, the Court must also consider society's need for fair and just punishment, respect for the law, and deterrence. 18 U.S.C. § 3553(a)(2).

Mr. Harrell readily admits that he committed a serious offense, and that he deserves punishment. Our requested sentence is serious punishment that will promote respect for the law and achieve deterrence. During that time, Mr. Harrell will be removed from his family and the community. He will be 50 by the time he is released from prison. This has important implications for what is a reasonable sentence.

Research from the Sentencing Commission demonstrates that individuals are much less likely to reoffend as they age. The Commission has repeatedly studied the relationship between age and recidivism and has always found a negative correlation. For example, in 2022, the Commission determined that the recidivism rate for those over 50 was less than half the recidivism rate for those under 50: defendants 50 or older reoffend at a rate of 21.3%, whereas defendants below 50 reoffend at a rate of 53.4%.[10]

---

[10] United States Sentencing Commission, *Older Offenders in the Federal System* (July 2022), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf.

11

Because Mr. Harrell will be 50 by the time he is released from prison, a sentence longer than 92 months is simply not necessary to promote respect for the law and achieve deterrence. This sentence also is sufficient given that the longest period of continuous custody Mr. Harrell previously served was **just 36 months**. PSR ¶ 34. To go from 36 months to a 92-month federal prison sentence is a sharp escalation of punishment that will provide strong deterrence and promote respect for the law.

Mr. Harrell does not dispute that he is in criminal history category VI, and he is ashamed of his prior convictions. Notably, however, most of his scoring prior convictions come from the year 2011, a tumultuous time in his life. For more than a decade since 2011, however, Mr. Harrell went without any significant arrests or convictions.

For its part, the government spends considerable space in its own position paper recounting the allegations from Mr. Harrell's prior cases. *See* Gov't Position Paper at 4–5, ECF No. 46. The Court should not give the government's argument more weight than it is due. Indeed, even the government concedes these are mere "allegations" that were not necessarily proven in court. *Id.* And many of the government's allegations come from cases that resolved to less serious charges, without a finding that Mr. Harrell engaged in physical violence. *See, e.g.*, PSR ¶¶ 36–38.

Our requested sentence of 92 months in federal prison also is sufficient considering the context for Mr. Harrell's offense. Mr. Harrell decided to return to selling drugs during a turbulent and uncertain time in his life. He had lost his good-paying job at Ardent Mills and fell back on drugs and alcohol to cope. In the fog of near-constant intoxication, Mr. Harrell sold drugs to make money and support his own addiction. But, as his letter to the

Court demonstrates, he has taken time during this past year to reflect on his choices and to put in the hard work toward securing a better future. He now sees that unresolved trauma from his youth led to destructive thinking and behaviors. His dedication to overcoming this negative cycle is abundantly clear in his robust programming and treatment record while in custody. He is smart and has dutifully absorbed his class materials and already restructured his thought patterns. He knows what it will take to avoid the negative choices of his past. This, in turn, shows that a sentence of more than 92 months is not necessary to comport his conduct with the law.

### E.  Ninety-two months does not create unwarranted disparity.

Granting a downward variance from the career-offender Guidelines will not create unwarranted disparity. As the Sentencing Commission data cited above show, the vast majority of career-offender defendants receive downward variances or departures from the excessive ranges recommended by career offender. And the average downward variance from career offender is approximately 40%.[11] Indeed, **just 20.2%** of career-offender defendants received a sentence within their Guidelines range.[12] Further review of similar cases in the District of Minnesota shows a downward variance for Mr. Harrell will not create unwarranted disparity. The following information was obtained from public filings in this District:[13]

---

[11] U.S. Sentencing Commission, Quick Facts: Career Offenders FY23, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Career_Offenders_FY23.pdf

[12] *Id.*

[13] Counsel recognizes defendants have different backgrounds and 3553(a) factors.

In *Unites States v. Justin White*, 22-cr-207-JRT, the defendant pleaded guilty to possessing with intent to distribute 40 grams or more of a fentanyl mixture (5-year mandatory minimum), felon in possession of a firearm, and possessing a firearm in furtherance of a drug-trafficking crime (consecutive 5-year mandatory minimum). With at least 160 grams of fentanyl and two firearms, the defendant's total offense level was 30, which, with criminal history category VI, yielded a Guidelines range of 168 to 210. On top of this, the 924(c) count required a mandatory consecutive 60 months. The government sought a total sentence of 190 months, particularly because the defendant had purchased a pill press capable of making 5,000 deadly fentanyl pills per hour. The defendant sought a 120-month sentence. In the end, the Court varied downward from the range of 168 to 210, and imposed 90 months on the drug count, along with the mandatory minimum penalty for 924(c).

In *United States v. Keith Haywood*, 22-cr-290-JRT, the defendant pleaded guilty to possessing with intent to distribute more than 230 grams of heroin, 41 grams of crack cocaine, 60 grams of cocaine, and 30 grams of a heroin/fentanyl mixture, some of which was already packaged for sale. The defendant also admitted to possessing two handguns in furtherance of his drug trafficking. Probation determined the defendant's Guidelines range was 110 to 137, based on total offense level 25 and criminal history category VI. The Court imposed 100 months.

**F. Mr. Harrell's "primary-state" custody status means the 11 months he has spent detained since his arrest likely will not count toward his federal sentence.**

Mr. Harrell's case began in state court and the federal government filed an application for a writ of *habeas corpus ad prosequendum* to bring him into federal court. *See* ECF No. 6 (*writ*); *see also* PSR at F.1 (noting that Mr. Harrell was arrested by state authorities on May 1, 2024, and detained by the federal Court in this matter on July 22, 2024, and that he has pending charges in state court). Mr. Harrell is in "primary-state" custody rather than federal custody, which means that as soon as his federal sentence is pronounced, he will be returned to state custody on his pending state matters. And, crucially, the BOP will not give credit for the time he's spent awaiting sentencing in this case if that time is credited toward any of his pending state cases. *See* 18 U.S.C. § 3585; BOP Policy 5880.28. Our requested sentence of 92 months accounts for the fact that the past 11 months likely will not be counted by the BOP. This equates to a "real" sentence of 103 months in federal custody.[14]

Mr. Harrell also asks the Court to order his federal sentence to run concurrently with his anticipated state sentences. If this Court imposes a concurrent sentence, Mr. Harrell's federal sentence will begin running the date it is imposed, April 15, 2025, with no credit for back time. But if the Court were to impose a consecutive sentence or remain silent on

---

[14] Mr. Harrell also asks the Court to also consider applying a modest reduction for "hard time," considering the last 11 months that he has spent at the county jail. It is widely known that time at Sherburne is more arduous than time spent in BOP, given the greatly reduced access to programs, family visits, and recreational opportunities at Sherburne compared to the BOP.

15

the consecutive-concurrent issue, the BOP would not begin running the federal sentence until after Mr. Harrell fully completes any state sentences he receives, even if those state sentences are ordered to run concurrent with his federal sentence. *See* 18 U.S.C. § 3585; BOP Policy 5880.28.

## II. CONCLUSION

Mr. Harrell respectfully requests that the Court impose a sentence of 92 months' imprisonment. This satisfies the requirements of 18 U.S.C. § 3553(a) and accounts for the type and quantity of drug involved, Mr. Harrell's swift acceptance of responsibility, and his deep commitment to continue working on his mental health and remaining law-abiding in the future.

Dated: March 30, 2025

Respectfully submitted,

*s/Matthew Deates*

MATTHEW DEATES
Attorney ID No. 0400318
Attorney for Mr. Harrell
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415